As you may recall from the briefs, this is a case where it is admitted that a water quality went. Appellees admitted below that there is, quote, no love lost, unquote, between Mr. Singer and Ms. Wint. Is that the same as saying that there is, what you just said, personal animosity toward the female president? First of all, I think the female part probably drops out, doesn't it? I mean, there was an issue below with regard to motivation being based on gender, but I don't see that in the papers as argued to us. Well, we believe to be the motivating factor for Mr. Singer's exhibiting ill will towards Squaw Valley and Nancy Wint began in a meeting where Ms. Wint was the only female there, and there were all these other men, including Mr. Singer, and she embarrassed Mr. Singer because she proved that he was wrong about something on water quality, and he became angry. That is undenied. They have not denied that he became angry. They have not denied that he was embarrassed as a result, and whether you look at that and say Mr. Singer was upset because he was showed up by a woman or whether you look at it and say Mr. Singer was upset because he was showed up by someone else is probably irrelevant. In addition, the district court found that the evidence suggests that Mr. Singer holds a, quote, general hostility, unquote, towards Ms. Wint. This case, therefore, squarely falls within the class of equal one, the class of one equal protection cases best exemplified by Judge Posner's Seventh Circuit decision in Esmail and the Supreme Court's decision in Olick. It is also admitted in this case that Squaw Valley has been treated differently than other similarly situated dischargers. Appellee's brief at page 45 states that, quote, Squaw Valley has shown disparate or unique treatment, unquote, in relation to other dischargers. Appellee's deny, however, that this difference in treatment is related to Mr. Singer's personal animosity, instead arguing that the disparate treatment against Squaw Valley is justified by its purported history of violations. The narrow equal protection question in this case, therefore, boils down to a single issue for this court to decide. Is there a question of facts here regarding whether Mr. Singer was motivated by personal animosity rather than protection of the environment? You know, that's a pretty – I know there are these, and you cite them, these class of one equal protection cases, but this phrase, this term, personal animosity, is pretty vague, huh? I mean, if there's just anything that says, that indicates that, you know, the accused person doesn't love the other person, that's enough? No, Your Honor. I don't perceive this to be a mate. I mean, how bad does this animosity have to be in order to rise, you know, to a constitutional violation? I don't perceive this to be a huge shift in the law, actually. There's Supreme Court cases all the way back into the 30s that talk about this. But if you look at this Court's decision in Armideris, this Court held that the rational relation test will not countenance behavior that is arbitrary or irrational or malicious. And so I don't think it's a large leap from maliciousness to personal animosity. If a person – if a regulator is regulating out of personal animosity, out of hate or spite or hatred or ill will, that falls within the Armideris classification. See, those words now, spite, hatred and ill will, to me are quite a bit stronger than personal animosity. I think personal animosity indicates that the – I don't see a distinction between animus and malice, Your Honor. Well, spite and hatred suggest, I guess, a more malicious source. I mean, I can have personal animosity towards somebody for perfectly legitimate reasons, start using words like spite and hate. At least the implication there is something more sinister. And I think the distinction may be useful if, excepting for a moment the defense position that, sure, there's hostility. This guy is frustrated by the repeated noncompliance and you've got a recalcitrant corporation here. And so, yeah, the pressure is built up. But if that is actually true, no matter how strong the feeling is, that's one with a rational basis, a connection to what the regulator is supposed to be doing. So if this – and I'll shift terms here to spite or hatred comes from, be it the episode that you cite or for whatever or somebody's brother-in-law or some kind of personal non-rational slash governmental factor, I think that's where you have to get to. And so the acknowledgment of personal animosity still leaves you something short of establishing the element, I think, that is necessary to make out whatever case is here. Judge Clifton, you raised an excellent point. I have two responses to that. The first is that in this case, as you've pointed out, it becomes a factual question. Is it just personal animosity? Does he just dislike her? Or does it really rise to the level of hate or ill will? We don't know. That's a factual question for a jury to decide after listening to Mr. Singer on the stand and after vigorous cross-examination. That's a factual issue. But more importantly, and getting right to the heart of your question, if there was some evidence of environmental harm in this case, then you might say, well, he's regulating out of a desire to protect the environment. But even Mr. Singer admitted under oath that he has no evidence the Squaw Valley has ever harmed the environment, no evidence that any sediment has ever entered the creek from any project at Squaw Valley, no evidence that any beneficial use has ever been harmed. When you start looking at the fact that the man who is regulating this corporation into the ground admits that he has no knowledge of any environmental harm being caused by that corporation, that raises a red flag that maybe there's another motive here. Or it could suggest he's saying it's been tough, but we've managed to keep them in line so they don't actually inflict harm on the environment. Well, that would be true if he was aware of any violations by Squaw Valley. But he admitted at deposition that prior to 1999 he wasn't aware of any violations by Squaw Valley. And it was beginning in 1999 that suddenly all of these things changed immediately following this meeting, whereby he was embarrassed. So Goldberg replaces Peacock, and now all of a sudden you've got a turbidity requirement that according to Squaw Valley defies logic. Absolutely, Judge Layton. What happens is all the other ski resorts still get to use a 3 NTU relative standard. If their natural background turbidity is 10, they get a standard of 13. We don't. We have to comply now with a 3 standard. Even though the standard for drinking water is 5. And we're told we can never exceed 3. And no other ski resort is held to that. And your assumption is background is somewhere around 7, 7.3? I believe my personal belief, if you're asking my personal belief from studying the data, I believe the background is about 4.3. I'm sorry. That's what the North Fork is. North or South Fork is. North Fork is 4.3. That's right. So if the South Fork would be 4.3, you're expected to clean it up some. It's according to their calculations, it's 5.14 in the South Fork versus 4.3. It's a very slight de minimis difference. Keep in mind, though, to get to that 5 number, Mr. Goldberg included data that Mr. Singer, even Mr. Singer admitted, should never have been included. It was intentionally skewed. You mentioned Mr. Goldberg. Let me ask you about him. I understand the case with regard to the animosity slash hatred of Mr. Singer. How about Mr. Goldberg? Is there really a case against him individually for having that kind of animus? No. Not on the animosity. Should he remain in the case as a defendant? Yes. But on the equal protection claim? Yes. On the equal protection claim, you can look at OLEC, and OLEC does not have in it a criteria for a criterion requiring animus. It just says that if there is differential treatment and it's not rationally related, then that's enough. Now, in OLEC, you have a 33-foot easement being required of the OLECs and a 15-foot easement being required of everyone else. In this case, you have an absolute 3 NTU standard being required of Squaw Valley and a relative standard being applied to everyone else. But did Mr. Goldberg apply? No, no, no. Goldberg wasn't responsible for everybody else, was he? If Goldberg was aware, and, again, it's a question of fact, if Goldberg was aware that he was enforcing these regulations against Squaw Valley differently than all the other dischargers, if he was participating with Mr. Singer in this scheme to get Squaw Valley, then I think, yes, he does come into the equal protection. But even if he doesn't fit in the equal protection, he definitely fits in the substantive due process. Is there any – I mean, I have to say, with regard at least to the equal protection, I have a much harder time with the case against Mr. Goldberg. Is there anything else other – I mean, I understand it's factual, but there are so many reasons why somebody may do what he's told to do, particularly when there is at least some basis for him to hear Mr. Singer and to believe that they've got a history, so we have to be especially vigilant. Is there anything else that singles out Mr. Goldberg's belief or conduct with regard to an equal protection claim? You know, Judge Clifton, I think that you could make the case that he was just following orders. You could also make the case that he knew that he was treating Squaw Valley differently. It depends upon the facts. Do you think there's a factual issue on that? I'm sorry? Do you think there's a factual issue with respect to Goldberg? I do, Your Honor. There is – I don't believe there's a factual issue that he harbored personal animosity or ill will. We don't have facts of that. You're about halfway through your time. Right. Let me just – Spend a couple minutes on the substantive due process. Thank you. Let me just skip to that. I appreciate that. The district court held that the substantive due process claim did not – that we did not prove our substantive due process claim basically because the district court applied the Smitty case and said that if false evidence was presented to LaHutton, it would overcome the presumption that the board exercised its independent judgment. But the district court said that the statements that were made at the hearing just simply represented a, quote, dispute, unquote, between Squaw Valley and Goldberg regarding turbidity calculations. That is not true. The LaHutton board only has jurisdiction over sediment in the water once there is a determination that the sediment is harming a beneficial use under California law. It was therefore critical to Singer and Goldberg to convince the LaHutton board that Squaw Valley was harming a beneficial use in order to obtain the referral to the attorney general. Incidentally, something that LaHutton has never done to any discharger, even PG&E, after it discharged hexavalent chromium, a cancer-causing material, into an entire town's drinking supply. They've never tried to refer a case to the attorney general formally, except this one. Anyway, we've set forth in our reply brief at pages 18 through 20 a variety of statements that were made to the board that we believe were untrue. But I would just like to quote one that is very direct. Quote by Mr. Goldberg, Water quality is being adversely impacted and subsequently several beneficial uses that are associated with Squaw Creek and its tributaries are also being adversely impacted, unquote. But in fact, when we were able to get Mr. Goldberg and Mr. Singer in deposition in this case, the truth came out. And we've set forth some of those deposition excerpts at pages 18 through 20 as well. But the truth is, as I previously indicated, they admitted they don't know of a single beneficial use that's been harmed. Couldn't name a single one. They don't know of any dirt or sediment that has gone into the creek as a result of Squaw Valley's activities, completely contrary to the representations that were made to the board. The board, therefore, could not exercise its independent judgment because it relied upon statements presented by its staff. In other words, if, quote, false evidence, unquote, was submitted to the board, that overcomes the Smitty presumption. And it's a question of fact for the trial of fact to determine whether the board at that point was exercising its independent judgment. And if the Court does not have any further questions at this time, I reserve the balance for my rebuttal. That's fine, Mr. Robertson. Thank you. Thank you. Okay. We'll hear from the what? The State? State board, I guess. Good morning, Your Honors. Janelle Richards, California Attorney General's Office, for Mr. Singer and Mr. Goldberg and their individual capacities. Squaw Valley has presented its view of how the regional board should order its enforcement priorities, and it's presented its view of how State laws and State water quality regulations should apply to it. But the question presented is whether a reasonable trial of fact could find that there is sufficient evidence in the record to support an equal protection or a substantive due process claim. The district court reviewed the evidence in this case in some detail in its order, and it noted that Squaw Valley had failed to compare apples to apples. That is, it failed to give the Court, and it fails to give this Court, a basis for evaluating disparity. Similar violations or similar projects by similarly situated dischargers. And today, for example, Mr. Robertson spoke about the WDRs. In the briefing, the WDRs at issue are for, I think, the resort at Squaw Creek and Homewood. But those WDRs are not in the record before this Court, and the Court cannot look at them and see whether or not they are similar. In addition, there's no evidence to support that. Let's get to a specific. We talked briefly about the turbidity, if I'm saying that correctly, figure. And it has been alleged that Squaw Valley is being asked, in effect, to comply with an absolute standard of 3.0, whereas others are permitted to comply with a relative standard. Is that true? There's no evidence in the record of what – I should back up a step. I'm not asking you. No, that is not. Are the other people different? Is that statement true? No. Not based on the evidence in the record, not based on the evidence before this Court, not based in the record. There's no evidence with regard to the turbidity levels imposed upon other sources? That's right. I don't believe there is one single WDR, which is the place where the board establishes – the regional board, not these individual defendants – establishes waste discharge requirements for individual dischargers. And in those waste discharge requirements are specific standards for discharge, including turbidity and other standards as well. So each – Okay. What about Squaw? I understand Squaw Valley's position also that the – that requirement, turbidity requirement, is lower than the actual background turbidity of that part of the stream. Is that true? I have no idea. Is there anything in the record on that? There is evidence that Squaw Valley placed in the record about what it believes it to be. But ultimately, the board has already decided that three – The board doesn't know what the turbidity is? Is that your position? The background turbidity? Turbidity? The board is not a defendant in this case. Only the two individuals are – No, no. But these people are acting on behalf of the board. They're enforcing board regulation. My question is, did the board – does the board know what the background turbidity is of that part of the river or the creek? I'm going to say that the standards that are established take into account the known data about what the background should be, because – Well, you just said you don't know whether it's more or less than the background turbidity. I'm sorry. I don't know whether the 3 NTU standard is more or less than the – no. That's not the position. Mr. Singer was asked – Do you know what the background turbidity is? Or do you – I mean, does the board know? I don't know. I don't know. There is a – Well, then you can't say – Presumably, it is lower – You can't say that, and they take it into account if you don't know whether they know or not. They establish the WDRs as levels that should be achieved. You're saying that's what they should do. I'm saying that – Well, you can't take the position that they don't know what the background turbidity is, and then to say they take – at the same time, they take it into account. I may have been confused about who we're talking about when I say – I am not the board. The regional board – Collectively. The regional board – the data that was before the regional board in establishing the WDRs is not a part of the record in this case, so I would be, to some extent, speculating about how that was arrived at, but there is a presumption that government action is regular. There's been no contention in this case that, for example, Squaw Valley has gone back to the board and said, you need to revisit our WDRs because they're impossible. Let me ask you this, or approach the question in this way. Was there a sea change when Mr. Goldberg replaced Mr. Peacock as the primary regulator of Squaw Valley with regard to the WDRs? Well, there is an assertion in the record on the part of Squaw Valley that the interpretation has changed. Mr. Singer testified that his interpretation all along was that it was – that the turbidity in the water body at issue is not supposed to be raised above 3 NTU, which is the standard that's set out in the WDR. So Mr. Singer has said, this has been my position all along. Squaw Valley has presented no evidence where – that shows that the turbidity standard was in practice interpreted differently by Mr. Goldberg or Mr. Singer, the defendants in this case. There is a letter that was signed by Mr. Peacock over Mr. Singer's signature. Mr. Singer testified that he didn't see it, and had he seen it, he would have pulled it back as being incorrect. But in that letter, it is consistent with – it could be read as consistent with a relative interpretation of the turbidity standard, yes. What is the significance to a water user where the – a turbidity standard is lower than that which is occurring naturally in the environment? Mr. Singer testified about that during his deposition, and he said that it would be unreasonable to require people to do the impossible, and he does not require that of anyone, including Squaw Valley. So his view is that achieving that standard is not impossible. Haven't you just established a factual issue with regard to his knowledge and whether he in fact changed the standards? I mean, he just told us that he acknowledged signing a letter, which he said he didn't read, in which it could be acknowledged that the standard is supposed to be applied or should be interpreted in a relative fashion, and that he testified that he always believed it should be absolute. Well, isn't that a factual issue that's not for us to resolve in summary judgment? No. Actually, Mr. Singer did not sign the letter. And if I said that, I misspoke. It was a Robert Dodds, who is one of his subordinates, and signed it over the typewritten signature line for Mr. Singer, and Mr. Singer testified in his deposition that he had not read that letter, had not seen it before it was put in front of him. In addition to that, Mr. Singer did not sign the letter. Wasn't it a fair presumption that the position taken by the agency because the letter was signed by somebody is fairly reflected in that letter and that the agency has thereby changed its position? Well, the letter actually was a letter to Squaw Valley about violation of their turbidity standards. So the position of the agency all along has been, this is an entity with a long history of noncompliance. So this is, in some ways, this letter and what it says is consistent with the positions that the individual defendants in this case have taken, which is that Squaw Valley is an entity that has had a longstanding issue with compliance. I apologize, Your Honors. Going back just quickly to the decision, Mr. Singer and Mr. Goldberg believe that it is correct in every respect. It could be adopted by this Court as a template for resolution of this appeal. As we laid out in our briefs, we attempted to address many of the factual issues, but in doing that, it sometimes may mask the fact that what we have at bottom here is a dispute between Squaw Valley and the regional board. At most, the evidence shows that Squaw Valley disagrees with Mr. Singer and Mr. Goldberg's interpretation and application of Squaw Valley's board-issued waste discharge requirements. There was some discussion today about beneficial uses. Beneficial uses are established by the board, and the waste discharge requirements set standards that are designed to achieve those beneficial uses. So when Mr. Goldberg at the hearing was discussing beneficial uses, he was discussing what the practical effects of violation of the turbidity standard were. In addition, Squaw Valley was given the opportunity to air its disagreements before the board, and the board ultimately disagreed with Squaw Valley and agreed with staff. So at this point, again, Squaw Valley's dispute is not really with these individual defendants, but with the regional board. And it's not appropriate in this case. Kennedy. But that kind of begs the question as to why it is the staff was motivated to persuade the board to take a given position. If an individual, hypothetical, not this case, if an individual is truly motivated by an improper motivation, and because of that goes and persuades the board to take a given position, which, frankly, staff members are frequently able to do because most boards approve staff recommendations put in front of them, particularly if the board is not made up of full-time. Who's on this board anyway? Members of the community, I believe. So I've served on those boards. I've seen the staff put the recommendations out there. So the fact the board says, okay, I'll go along with the staff, does that insulate the staff member, even we've acknowledged that he's got the illegal motivation? Certainly not in every instance. But the problem in this case is there is no evidence of improper motive, and as the district court noted as well, no evidence that these individual defendants lied to the regional board. But that goes back to the issues we talked about before. It seems to me the approval by the board really is not much of a factor here. It doesn't insulate Mr. Singer, Mr. Goldberg. I'm not sure that I would use the term insulate, but it certainly has been recognized in the case law from this Court that where we're dealing with a recommendation and there isn't anything improper about the recommendation, the fact that the plaintiff the defendant in the 1983 case is not the ultimate decision-maker insulates the person who made the recommendation from liability, and that's in the case that the district court cited, which is the Smitty v. Varney case, but it's also in the Sinaloa Lake Owners Association case that we cited in our briefs. In addition, there's been discussion today about animus and the difference between animus and disagreement, frustration, hostility. Squaw Valley's view is that a plaintiff can survive summary judgment simply by presenting some evidence of disagreement between the regulator on the one hand and the regulated entity on the other. If this were correct, one would expect to see it reflected in the case law, but Squaw Valley has cited no cases where constitutionally improper motives have been inferred from mere regulatory disagreement or regulatory friction. The cases that are most analogous are this Court's selective enforcement cases, cases such as Freeman v. City of Santa Ana, Armendariz v. Penman, Patel v. Penman. And in all of these cases, the Court has required some evidence that the official is acting from a personal or extra-statutory motive. A good example is the Armendariz case in which the city was enforcing housing codes and the allegation was that they were enforcing these to drive certain low-income housing out of business. And in that case, the plaintiff presented evidence that the city contacted an intermediary who would purchase the property. That person drew up a list of property based on where he believed the appropriate location for the shopping center that they wanted to build would be, handed the list to the city, and the city immediately began aggressive code enforcement against those very same properties. In contrast, the case of Patel v. Penman, which in some respects is very factually similar, in that case, there was simply an assertion of improper motive and some pieces of evidence. There was a newspaper article in which the city attorney was quoted as talking about code enforcement and elimination of blight in the same sentence, in addition an internal memo about the role of code enforcement in reducing blight, suggesting that there might be some link between the use of the code enforcement and shutting down businesses. And the Court said, these documents give us serious concern, but they're not sufficient to suggest that there is an improper motive in this case. So in this case, in our case, the Squaw Valley case, we have even less evidence of improper motive. And if we turn back to the meeting, the 1999 meeting that Mr. Robertson referred to, what about the point Mr. Robertson made? It was really with respect to Mr. Goldberg, but I think it applies maybe according under your argument as much to Mr. Singer, and that is that, well, under the case law, evidence of animus is not required. All you need is differential treatment. Isn't that more or less what he said? He may have said that, but the case law still requires that there be either an improper motive. First of all, the different treatment has to be as between people or entities that are similarly situated. And there is differential treatment in this case in the fact that Squaw Valley has been the subject of increased scrutiny. But Squaw Valley has not identified other similarly situated dischargers, dischargers with a history of noncompliance that reaches back to the 70s, that are as large and active as Squaw Valley. And without that, it's one cannot compare whether there was someone, some other entity that should have also been the subject of such scrutiny. But in any event, the very same facts, the fact that they are large, that they have a history of noncompliance, that they tend to dispute staff recommendations and decisions, gives a rational basis for the decision to focus regulatory scrutiny on Squaw Valley. Let me ask about the history of noncompliance. In some place I've seen, but now cannot find, the testimony by Mr. Singer that was referred to earlier with regard to his knowledge of violations. Could you refresh my recollection or give us your understanding of what it was that Mr. Singer testified to and what the implications of that are for the case? Yes, Your Honor. During the deposition of Mr. Singer, the issue of the reasons behind replacing Mr. Peacock with Mr. Goldberg came up. And the specific quote that is cited in Squaw Valley's brief is about the exchange. And I believe the question was something to the effect of, is it your position that Mr. Peacock was missing violations on the mountain during that time period? And Mr. Singer's answer was, I wasn't up there every day, something to that effect, that he did not have a personal basis to know whether or not there were specific violations being missed. However, the record does not support an inference that Mr. Singer was not aware of Squaw Valley. Mr. Singer, and we're talking right around 1999, right in this window of time, Mr. Singer had issued several administrative orders against Squaw Valley. These are set out in our papers and additionally set out in the history of noncompliance that's in the district court's decision. And also the meeting that was discussed by Mr. Robertson with Ms. Singer, I mean, excuse me, with Ms. Wendt, that meeting was about a noncompliance issue. Mr. Singer's opinion was that they had failed to construct certain wetlands on time, and that was why the meeting was occurring. And while I'm on the topic of that meeting, we did note in our brief that that exchange was not raised below as the impetus for a campaign of vengeance. Below, the behavior of Mr. Singer during that meeting was offered up as evidence of gender-based animus. And so because this issue was not argued below, it is weighed for purposes of appeal. Going back to some of the case law, again, if mere evidence of disagreement were sufficient, the case law would look very different. In fact, the cases cited in our briefs show that improper motive cannot be inferred from mere uneven application, from the fact that enforcement is some sense, in some sense, selective or unique, and it certainly can't be inferred simply because there is a history of issues between the regulated entity or the government officer and the plaintiff. The Butler v. L case makes this clear. In that case, the plaintiff had filed certain complaints and was a very outspoken critic of the sheriff's department, and the evidence showed that the sheriff openly disliked the plaintiff. And yet the Court would not infer from this that the sheriff's authorization of an investigation of the plaintiff was motivated by his dislike. There has to be evidence of causal connection between the asserted improper motive and the behavior, and we do not have that in this case. Any other view of the law would create a civil rights claim every time a recalcitrant regulated entity succeeded in frustrating the regulator, and this is not the function of the Constitution or of Section 1983. If I'm ---- Well, let me pause on that. Because it would mean a claim. Well, the potential of the claim is always there because for a couple hundred dollars you can file a lawsuit. I think the difficulty that we may have here is whether it's a claim that can be resolved in summary judgment, whether we can take the record and eliminate those contested issues that could permit a trier of fact to reach factual conclusions that could support a claim. And so I don't quarrel with your statement, but we have to keep in mind what stage we're at. I understand, Your Honor. And I think the difference here is this ---- the assertions and allegations and contentions in this case were sufficient to survive a motion to dismiss. They are not sufficient for purposes of summary judgment. And I would direct the Court to an out-of-circuit case, but a case that is very factually on point, and that is the Discovery House case v. City of Indianapolis. I believe it's out of the Seventh Circuit, and it's cited in our brief, in which the government actors actually made a mistake about their application of the zoning ordinance, and the Court found that that is not a constitutional violation. It is not arbitrary. These types of disputes do not arise to constitutional violations in the case law. If I may sum up briefly, the Constitution does not guarantee Squaw Valley the right to decide which regulator will inspect it. It doesn't get to decide the methods of enforcement that are appropriate or when they're appropriate. The Constitution doesn't guarantee Squaw Valley the right to decide whether it has violated State water quality laws. That decision rests with the regional board and with the State courts where an enforcement action has been filed, as it has in this case by the Attorney General's office. The evidence viewed in the light most favorable to Squaw Valley shows only that Squaw Valley is an entity with a history of noncompliance, and that Mr. Singer and Mr. Goldberg were carrying out their regulatory duties, motivated not by animus or by an extra statutory purpose, but by a desire to cause compliance with State water quality laws, because the Constitution does not guarantee a right to regulation by consensus. Mr. Singer and Mr. Goldberg request that this Court affirm the judgment below. By the way, is the enforcement action still pending? Yes, it is, Your Honor, as far as I know. All right. Thank you very much. Rebuttal? Yes, Your Honor. Thank you, Your Honor. Do you know at what stage that enforcement action stands today? I believe that it is in discovery, but whether it will be dismissed or not by the Attorney General, I don't know yet. What is it, an injunctive action, penalty action, a combination? Or you don't know? I'm not sure, to be honest with you. All right. Go ahead. Well, first off, the Discovery House case does not apply. This is not a mistake we're talking about. We are alleging this as an intentional campaign. The meeting that police indicate was not argued below, it was argued below. Go back and look at our motion for – our opposition to their motion for summary judgment. We referenced the specific meeting, talking about the fact that Mr. Singer had miscalculated the flood flows, and then Ms. Wendt told him that, and he became angry, because it turned out she was right. It was argued below. Judge Tashima, you referenced the Olic case. There is a dispute among the courts right now as to whether Olic requires a showing of ill will, but the actual reading of the majority opinion does not say that. It just says disparate treatment coupled with lack of rational basis. Judge Breyer's concurring opinion references the ill will. Counsel, I'm focused on – I hate to keep coming back to turbidity, but it's sort of, in my mind, a symbol of – It's not too clear. It's a symbol of the campaign, as you referred to. What is the real-life impact to Squaw Valley of the change in interpretation to an absolute turbidity requirement? How does that affect Squaw Valley in the real world? Excellent question. What does it do? It puts us out of compliance all the time, and it allows them to bring enforcement action after enforcement action and clean-up and abatement order after clean-up and abatement order against us and anything else they want, because they constantly say that we're out of standard. I'm glad you brought – Is that happening? Yes. And I'm glad you brought that up, Judge Layton, because let's look at this May 1, 1995 letter from Harold Singer that he never saw, supposedly, that sets forth the relative standard. Let's look at the facts. That letter was drafted by somebody else, Jerry Peacock, the senior water quality enforcement officer. He has a master's degree from Stanford in hydrology. He knows these standards. He drafted not only the standard for Squaw Valley, for all the other ski areas. He testified that the standard that's to be applied to all the ski areas is supposed to be the same, that is, JER 2465. He testified that two years after Singer and Goldberg changed the standard for Squaw Valley, they had never told him. All the other ski resorts, he's still regulating them under the relative standard. That May 1, 1995 letter is signed by Robert Dodds, but at deposition, I asked Mr. Singer, did you authorize Mr. Dodds to sign letters on your behalf? Well, yes, I did. How can he now say, these are not my words, this is not my letter? He changed the standard. Jerry Peacock, that same standard has been enforced against all the ski resorts for the last 10 years, except now, since 1999, it's not being enforced as a relative standard. It's an absolute standard against Squaw Valley. Let me suggest that Appleese indicate that we haven't presented an apples-to-apples comparison. I want to tell you a very ironic situation. Squaw Valley, beginning in late 1999, after Jerry Peacock was removed from Squaw Valley, he was assigned to a company called IntraWest. That company began construction in 2000 of a village in our parking lot, Squaw Valley's parking lot. Because Mr. Goldberg was regulating Squaw Valley, if we had been building that village, the absolute 3 NTU standard would have been applied to us. But because Mr. Peacock was regulating the construction of that village, he was applying the relative standard, right on our own property, same water, going into the same creek. The only difference is who owns the construction. Now that is not an apples-to-apples comparison. That is an apple-to-apple comparison. That is the left half of the apple and the right half of the apple. Well, I understand the State's position to be it depends upon the WDR or whatever. Is there anything in the record that tells us what the standard applicable to Intra, whoever it was, or some other ski area? Yes. Just go back to Jerry Peacock's deposition. He's the man who wrote the standards. It's JER 2465. He says the same standard applies to all the ski areas, or at least it's supposed to. That's why we didn't put the WDRs in the record. We don't need them. The same standard is intended to apply, and that's undisputed. Thank you. When you look at the May 1, 1995 letter, I just want to make sure that there isn't any confusion on one point. That is a letter from Mr. Singer to our water quality attorney, Adolph Moskowitz, explaining the standards. In there it refers to 3 NTUs over background or 10 percent. Just so you'll know that that is the 3 NTUs applies to the average, the 10 percent applies to the single instance. That's the court record, course record 81 at page 48. I just want to make sure you're not confused by that. In sum, this Court held in Tovar that it is generally – excuse me just a second. This Court held in Tovar v. Bill Meyer, 721 Fed Second 1260, the summary judgment is usually inappropriate in cases dealing with motive. Quote, because evidence concerning motive is almost always subject to a variety of conflicting interpretations, a full trial on the merits is normally the only way to separate permissible motivations from those that merely mask unconstitutional conduct. I suggest to your honors that that's what's going on here. There is a legitimate question of fact here, primarily because they've admitted there's no harm to the environment. And if there's no harm to the environment, why are they regulating us under a microscope and why did things suddenly change in 1999 following the meeting with Ms. Wendt where she and Mr. Singer sort of got into it? Your honors, unless you have any further questions, I would submit on that. All right. Thank you. We thank both counsel for the very fine argument. This case is submitted for decision. Being the last case on our calendar today, we stand in adjournment for the day. All rise. This court for the destruction of the stand is adjourned.
judges: Goodwin, Tashima, Clifton